# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

APRIL ESTRADA, as Personal Representative
of the Estate of JOSE RAMON ESTRADA, and
as Next Friend of D.E., J.E., and D.E., Minors,

        Plaintiff,

v.                                No.  CV 14-00058 WJ/WPL

OFFICER ERIK COOK, OFFICER ERICK
GUERRA, OFFICER RICHARD GARCIA,
Individually and in their Official Capacities,
THE CITY OF LAS CRUCES and THE CITY
OF LAS CRUCES POLICE DEPARTMENT,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon the Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, **(Doc. 14)**, filed August 6, 2014, by Defendants City of Las Cruces ("City") and Officers Erik Cook, Erick Guerra, and Richard Garcia. Having reviewed the parties' briefs and applicable law, the Court finds that the motion is well taken with respect to Plaintiff's federal claims. Therefore, the motion is **GRANTED IN PART AND DENIED IN PART**, in that Plaintiff's federal claims are dismissed with prejudice, and Plaintiff's state-law claims are dismissed without prejudice.

**FACTUAL BACKGROUND**

The following facts are taken from audio or video recordings of the incident in question or are otherwise undisputed except where noted. On the afternoon of July 2, 2013, a woman called the Mesilla Valley Regional Dispatch Authority ("MVRDA") and, according to audio recordings, reported that a man in a white shirt was "walking around . . . with a rifle" in a trailer park near the intersection of Bronco Way and Branding Iron Circle in Las Cruces, New Mexico. *See* (**Doc. 14 Ex. 2**), Audio at 15:35:55. The dispatcher contacted City police officers Garcia and Cook, gave them the location reported by the caller, and advised them that there was "a male subject with a rifle [who] looks like he's pointing it at someone." *See id.*, Audio at 15:36:31.

Almost simultaneously, another caller to MVRDA reported a domestic dispute on Branding Iron Circle, stating that her neighbor was armed with a bat and that another man was armed with a pellet gun that looked like a rifle. A dispatcher passed on this information to officers. A third caller also reported that "a guy over here with a gun . . . came into my house" saying that the caller needed to help hide the armed man because the cops were looking for him. The caller said that the armed man was intoxicated, and he clarified that the gun "look[ed] like a machine gun" but was in fact a pellet gun.

Garcia arrived on the scene first, which the third caller to MVRDA reported to dispatch. In a sworn affidavit, Garcia states that he approached a witness who told him that a man with either a gun or a pellet gun had pointed the firearm at the witness and told the witness to hide him. *See* (**Doc. 14 Ex. 3**), Affidavit. The witness also told Garcia that the weapon looked "just like" the AR-15 rifle that Garcia himself was holding. *See id.* Plaintiff disputes that Garcia was told the man might have a real rifle but provides no evidence to the contrary. The witness pointed out the armed man's trailer to Garcia just as Cook arrived.

2

Garcia shared his information with Cook, and the two officers proceeded to the armed man's trailer. As they did so, other witnesses pointed out Decedent Jose Estrada, who at this time was standing outside the trailer in question, and they informed the officers that Estrada was the man who had been walking around with a weapon.

In their affidavits, Garcia and Cook say that Estrada, now shirtless and unarmed, returned inside his trailer. The officers took cover behind a nearby shed and attempted to communicate with Estrada, who they now say yelled at the officers in an agitated state and continued to walk in and out of his trailer. The officers also say that three minor females were in Estrada's trailer and that he repeatedly yelled at them and pushed them back into the home whenever they attempted to leave. *See* **(Doc. 14 Exs. 3 & 4)**, Affidavits. Although Plaintiff claims that "video camera footage taken at the scene clearly shows that Mr. Estrada did not go back into his mobile home after he was confronted by the officers" and did not yell at or force the girls back into the house, the video he cites does not appear to cover the time in question.

As other officers arrived at the scene, Garcia requested that they set up a perimeter and told them that Estrada was armed. He informed the officers that people were "saying it's a pellet gun, but it looks just like our rifles." **(Doc. 14 Ex. 2)**, Audio at 15:42:17. One of the officers who arrived at that time was Guerra, who had been monitoring the dispatch calls. Garcia requested that Guerra move his vehicle into the trailer park so that the officers could use it for cover. When Guerra arrived, either Garcia or Cook asked him to arm himself with his bean-bag shotgun instead of his standard-issue AR-15.

The three officers moved closer, stopping about thirty-five yards from Estrada's home and positioning themselves behind the driver's-side door of Guerra's vehicle. The video clip from Garcia's lapel camera, **(Doc. 14 Ex. 7)**, Video, begins around this time and depicts Estrada

halfway out his front door, two girls on the front porch facing him, and one girl around the back of the building. Nine seconds into the video, as the officers discuss moving closer, the camera swings back and shows Estrada on his front porch facing the third girl while the other two reenter the trailer. The officers state in their affidavits that Estrada had forced the other two girls to go back into the trailer, though Plaintiff disputes this. At this time, Garcia shouts, "Step over here!" Twenty-two seconds into the video, Garcia radios dispatch to report that Estrada would not stop yelling, that he made a girl go back inside, and that he would not step all the way out the door. Four seconds later, Estrada is no longer on the front porch and his front door is closed.

About forty-two seconds into the lapel video clip, a creaking sound can be heard, movement can be seen in the shadows of Estrada's front porch, and an officer reports movement at the door. Garcia again shouts, "Come here! Step over here!" while Estrada can be heard repeatedly responding, "Go back!" and "Get the fuck out of here!" *See id.*; *see also* (**Doc. 14 Ex. 8**), Affidavit. At one minute five seconds, the front door appears to be half-open with Estrada not visible on the porch. Shortly thereafter, an officer can be heard saying, "I can hit him from here, but it won't be effective"; in his uncontroverted affidavit, Guerra says he was discussing the effective range of his bean-bag shotgun at this time. The officers discuss moving closer to Estrada's trailer at this time. As they do so, another officer instructed the girl who was outside the trailer to jump over the property's perimeter wall, and it appeared to him that she was going to do so. *See* (**Doc. 14 Ex. 5**), Affidavit; *see also* (**Doc. 14 Ex. 2**), Audio at 15:48:19.

At one minute twenty-seven seconds into the video, the camera swings to show Estrada reentering his trailer as the officers shout, "Step out! We just want to talk about what happened!" Almost ten seconds later, the video depicts the officers motioning to someone and shouting, "Hurry!" as the camera pans to show one of the girls running from the front door of the trailer

toward the officers. At one minute forty-one seconds, as the girl moves closer to the officers' car, Estrada is not present on the porch, though his front door is halfway open.

At one minute forty-seven seconds, Guerra says, "He's got a rifle," and the girl screams. Four seconds later, a man is heard yelling "Get back!" In their affidavits, the officers each state that Estrada had exited the trailer and aimed what appeared to be a rifle at them. One second later, the video records the sound of four gunshots. The officers state that Garcia fired three rounds from his rifle while Cook fired one round from his own; meanwhile, Guerra also fired four bean bags at Estrada. Although the time on the video appears to be inaccurate, the audio of the call regarding shots fired is logged at 3:49 p.m. *See* (**Doc. 14 Ex. 2**), Audio at 15:49:16. It was later determined that Estrada had been hit twice by the officers' rifles.

Garcia, Cook, and Guerra approached Estrada as he lay on the porch. Along with other officers who continued to arrive, the three officers spent much of the next few minutes preparing to clear the house. No one disputes that neither Garcia, Cook, Guerra, nor any other officer rendered medical aid to Estrada during that time.

Paramedics with the Las Cruces Fire Department were already en route by 3:53 p.m. and were directed to gather at a nearby staging area. *See* (**Doc. 12**), CAD Response Report; (**Doc. 14 Ex. 2**), Audio at 15:53:29. Not quite four minutes after the shooting, an officer is overheard on Garcia's lapel camera saying that Estrada was to be pulled out, and Cook and another officer pick Estrada up and carry him to a police vehicle, where they place him in the back seat. *See* (**Doc. 14 Ex. 7**), Video at 5:26; (**Doc. 14 Ex. 9**), Affidavit. In less than a minute, two officers had moved Estrada to the staging area to receive medical treatment.

Three officers, including the two who moved Estrada, say in sworn affidavits that Estrada was removed from the police vehicle, given a wound assessment, and administered first aid once

they arrived at the staging area. *See* (**Doc. 14 Exs. 9, 14, & 15**), Affidavits. The officers say, and

Plaintiff does not dispute, that Fire Department paramedics arrived and began caring for Estrada

"moments later" or "a short time later." *See id.* Audio recordings indicate that paramedics had

been given Estrada air through an air mask and were otherwise administering first aid no later

than 4:06 p.m. *See* (**Doc. 28 Ex. 4**), Audio at 0:27.[1]

Estrada was loaded onto an ambulance and moved to a site where a medical helicopter

was expected to land. He was then transported to a nearby hospital in Las Cruces, arriving at

4:36 p.m. From there, Estrada was transported to a hospital in nearby El Paso, Texas, but was

pronounced dead at 6:38 p.m., two minutes after landing.

The weapon Estrada was holding was determined to be a pellet gun. Although Plaintiff

claims that the weapon was "a pellet gun with a red plastic tip," *see* (**Doc. 28**), Response Brief, at

4, color photographs of the firearm taken at the scene and later do not show a red tip; instead, the

weapon is completely black, *see* (**Doc. 14 Ex. 10 Atts. A-C**); (**Doc. 14 Ex. 11 Att. A**).

### PROCEDURAL BACKGROUND

Plaintiff, representing Estrada's estate and his minor children, filed her complaint on

January 21, 2014. Pursuant to 42 U.S.C. § 1983,[2] Count I alleges that the actions taken by Cook,

Guerra, and Garcia violated Estrada's Fourth, Fifth, and Fourteenth Amendment rights, while

Count II brings a claim of gross negligence against these Defendants[3] pursuant to the New

Mexico Tort Claims Act ("NMTCA"), N.M.S.A. 1978, § 41-4-1 *et seq.* Count III alleges that the

City is vicariously liable for the individual Defendants' excessive force under both § 1983 and

---

[1] At around 2:40 in this exhibit, an officer identified by Plaintiff as Miranda Baker requests information on a "Joey or J. Estrada" at his address. This same call is made on dispatch audio tagged at 4:08 p.m. *See* (**Doc. 14 Ex. 2**), Audio at 16:08:32.

[2] "[Section] 1983 creates a cause of action against individuals who violate federal law while acting 'under color of state law.'" *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1353 (10th Cir. 1996) (quotation omitted).

[3] Although Plaintiff brings an NMTCA claim against the City here as well, she brings that same claim against the City in Count III. The Court therefore construes Count II as against only the individual Defendants and Count III as stating Plaintiff's NMTCA claim against the City.

the NMTCA. Count IV alleges that Cook, Guerra, and Garcia unreasonably denied Estrada medical care in violation of the Fourth, Eighth, and Fourteenth Amendments (via § 1983) as well as the NMTCA. Finally, "Count V" simply seeks punitive damages for the other claims.

Defendants filed the instant motion in August 2014. Since the motion asserts a claim of qualified immunity, Defendants also sought a stay of discovery, which United States Magistrate Judge William P. Lynch granted.

In lieu of responding to Defendants' motion, Plaintiff filed an affidavit seeking additional discovery pursuant to Federal Rule of Civil Procedure 56(d). Plaintiff specifically sought discovery on whether the individual Defendants knew Estrada may be armed with a pellet gun and whether Estrada was holding a gun when he was shot, as well as leave to depose Defendant Cook and the medical examiner who performed Estrada's autopsy. Judge Lynch granted Plaintiff's request insofar as she sought discovery on whether Estrada was holding a gun when shot and whether he received prompt medical assistance, allowing Estrada to submit affidavits from up to eight witnesses on these issues. However, Judge Lynch denied Plaintiff's request for any other discovery, including on the issue of whether the Defendants knew Estrada was carrying a pellet gun. Judge Lynch then set additional deadlines for Plaintiff to submit the permitted affidavits, for Plaintiff to file her response to the instant motion, and for Defendants to file their reply. However, Judge Lynch also warned the parties that no additional extensions of those deadlines would be granted. *See* (**Doc. 26**), Order.

On the deadline set by Judge Lynch, Plaintiff filed five purported affidavits. Of those, two were unsigned, and one was not dated. Plaintiff included with these filings a statement that she would "supplement the Court with signed copies of the Affidavits immediately upon receipt from these witnesses." *See* (**Doc. 27**), Notice. Plaintiff never submitted signed copies of said

affidavits. The parties' remaining briefs were timely filed in accordance with the deadlines set by Judge Lynch.

LEGAL STANDARDS

## I.       Summary Judgment

Summary judgment is appropriate where the pleadings, discovery materials, and affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit, and the dispute is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted).  In ruling on a motion for summary judgment, the Court may neither make credibility determinations nor weigh the evidence. *See Gossett v. Oklahoma*, 245 F.3d 1172, 1175 (10th Cir. 2011) (quotation omitted).

Under normal circumstances, the party seeking summary judgment bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *See, e.g.*, *Celotex*, 477 U.S. at 323; *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  Once the movant meets this burden, the nonmoving party must designate specific facts showing that there is a genuine issue for trial. *See, e.g.*, *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256. The existence of some alleged, immaterial factual dispute between the parties or a mere "scintilla of evidence" supporting the nonmoving party's position will not defeat an otherwise properly supported motion for summary judgment. *See Anderson*, 477 U.S. at 252, 256.

## II.        Qualified Immunity

Additional steps are taken when a summary judgment motion raises a defense of qualified immunity. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* The court may consider either of these prongs before the other "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Rojas v. Anderson*, 772 F.3d 1000, 1003 (10th Cir. 2013) (internal quotation marks omitted).

At the summary judgment stage, a court generally must "view the facts and draw reasonable inference 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *id.* unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," *id.* at 380. "However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record . . . ." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (citation omitted). "In short, although [courts] will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (internal citations omitted).

ANALYSIS

**I.      Exhibits to Plaintiff's Response**

In their reply brief, Defendants voice concerns regarding the admissibility of evidence submitted by Plaintiff. The Court shares these concerns and raises some of its own before turning to the substance of the motion for summary judgment.

A.   "Affidavits"

The Court first observes that of the five unnotarized "affidavits" submitted by Plaintiff on the deadline set by Judge Lynch, two are unsigned. *See* **(Doc. 27 Exs. 4 & 5)**. Although Rule 56(c)(1) permits a party to submit affidavits in support of his position, "[a]n unsigned affidavit …does not constitute evidence" for these purposes. *See Flemming v. Corr. Corp. of Am.*, 143 F. App'x 921, 925 n.1 (10th Cir. 2005); *see also Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006) (affirming the exclusion of unsworn affidavits for summary judgment purposes). Even an unsworn declaration must be signed "under penalty of perjury" to have the same force and effect as an affidavit. *See* 28 U.S.C. § 1746; *see also Elder-Keep*, 460 F.3d at 984.[4]

Plaintiff does not attempt to hide the insufficiency of these affidavits, instead insisting that she would "supplement the Court with signed copies . . . immediately upon receipt." Since the unsigned affidavits were submitted on the deadline set by Judge Lynch, the Court would normally interpret Plaintiff's statements as a blatant attempt to grant herself an extension of that deadline, thereby circumventing Judge Lynch's express warning that no extensions of that deadline would be allowed. Such an action would be beyond troubling, and the Court would ordinarily be inclined to direct Plaintiff to show cause as to why sanctions should not be imposed for her conduct. On the other hand, Defendants do not request sanctions, and in any event

---

[4] Similarly, a third unnotarized "affidavit," although sworn under penalty of perjury, is not dated. *See* **(Doc. 27 Ex. 3)**. However, Defendants do not challenge this particular affidavit, and the Court is unaware of any instances where an otherwise valid affidavit or declaration has been stricken merely for not being dated.

10

Plaintiff never filed the untimely signed copies of the affidavits as promised. The Court therefore does not consider whether Plaintiff's actions constitute sanctionable conduct and will instead simply strike the deficient "affidavits" of Cecilio Talamantes, **(Doc. 27 Ex. 4)**, and Donna C. Brumbaugh, **(Doc. 27 Ex. 5 & Doc. 28 Ex. 1)**.[5]

    B. <u>Hearsay</u>

Defendants also challenge two other exhibits to Plaintiff's response: a police report marked "draft" featuring statements from Brumbaugh, **(Doc. 28 Ex. 2)**, and the transcript of an interview with Brumbaugh conducted by a City police detective **(Doc. 28 Ex. 3)**. In the draft report, the detective notes Brumbaugh's statement to him that she had called 911 and told the dispatcher that Estrada was carrying "a possible pellet gun." In the interview transcript, which is undated but appears from context to have been taken shortly after the shooting, Brumbaugh tells the same detective that she thought the weapon was a pellet gun because (1) she heard others say so, and (2) she had heard Estrada drop the gun and "it sounded plastic." Defendants argue that Brumbaugh's statements as recorded in both documents amount to hearsay that may not be considered at the summary judgment stage.

The Court rejects Defendants' challenge to the statement in the interview transcript. The statements in question reflect that Brumbaugh thought, based on her own observations and statements from others, that Estrada's firearm was a pellet gun; they do not reflect that she relayed this information to any officers or the MVRDA dispatcher prior to the shooting. Plaintiff is not citing Brumbaugh's statements here for the truth of the matter asserted, as there is no dispute among the parties that Estrada was actually armed with a pellet gun. Accordingly, the Court sees no need to strike any portions of that passage as hearsay.

---

[5] That said, the Court notes that even had the affidavits been properly signed, they would not have altered the analysis that follows. Brumbaugh's statements to the MVRDA dispatcher are memorialized in the audio recordings submitted by Defendants, and Talamantes's testimony is not materially different from that of other affiants.

On the other hand, the draft police report clearly contains double hearsay, as it relays Brumbaugh's statement to the detective regarding her own earlier statement to the MVRDA dispatcher. Brumbaugh's recollection to the detective of her statement to the dispatcher does not appear to fall under any exception to the rule against hearsay under Federal Rule of Evidence 803, and there is no indication that Brumbaugh is now unavailable so that Rule 804's exceptions are triggered.

For that matter, even if Brumbaugh's recollection was not itself hearsay, there is no applicable exception that would cover the draft police report's recording of that recollection. *See* FED. R. EVID. 805 (disallowing double hearsay where both levels do not fall under an exception to the rule against hearsay). Although Rule 803(8) allows for limited exceptions that may cover police reports, Brumbaugh's statements are neither a record of the police department's activities, a matter observed while under a legal duty to report, or factual findings from a legally authorized investigation. *See* FED. R. EVID. 803(8)(A)-(C); *see also, e.g.*, *Chase v. Cedar City Corp.*, 2006 WL 2623934, at *1 (D. Utah Sept. 13, 2006) (unpublished) ("It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not." (quoting *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983)). Nor do either of these levels of hearsay fall under the residual exception in Rule 807, as Brumbaugh's statement is not more probative than other evidence that the parties obtained through reasonable efforts—including, in this case, a recording of Brumbaugh's call, *see* **(Doc. 14 Ex. 2)**, Audio at 15:36:54.[6] *See* FED. R. EVID. 807(a)(3). The Court will therefore disregard the draft police report, **(Doc. 28 Ex. 2)**, to the

---

[6] The second caller to MVDRA identified herself as "Donna" and gave the same address as that listed in Brumbaugh's unsigned affidavit.

extent that it is cited to support the allegation that Brumbaugh told the MVRDA dispatcher that Estrada's firearm was a pellet gun.

## II.  Use of Deadly Force Under § 1983

The Fourth Amendment protects against unreasonable searches and seizures, U.S. CONST. amend. IV, including a police officer's objectively unreasonable use of lethal force, *see Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). "Deadly force is justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (quotation omitted). The reasonableness of the use of deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *United States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014) (quoting *Graham*, 490 U.S. at 396). "[I]n the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Larsen*, 511 F.3d at 1260 (citation omitted).

Whether a use of force is objectively reasonable is a fact-dependent question. *Mosley*, 743 F.3d at 1329. The Court therefore begins by briefly reexamining the relevant facts of the case. Here, the individual Defendants received information that Estrada had entered one neighbor's home, threatened at least one person, was armed with a weapon that might be either a pellet gun or an actual rifle, and was roaming the neighborhood with this weapon. At least one person told the officers that Estrada might be intoxicated. Upon their approach, the officers

observed Estrada speaking and moving in an erratic manner, shouting out profanity and warnings to them while moving in and out of his trailer. After a child fled the trailer and ran towards the officers, Estrada returned from inside the building with a black weapon similar to an AR-15 rifle, which he then proceeded to aim at the officers.

Whether the use of deadly force is reasonable—that is, whether officers have probable cause to believe that someone poses a serious threat of physical harm to the officers or others— turns on, among other things, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Mosley*, 743 F.3d at 1329 (quoting *Graham*, 490 U.S. at 396). Moreover, factors relevant to whether a threat of serious harm existed include "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Larsen*, 511 F.3d at 1260 (citations omitted).

Here, even prior to his encounter with the individual Defendants, Estrada was alleged to have menaced a neighbor with a suspected pellet gun and roamed the neighborhood with that or another weapon while possibly intoxicated. Estrada then aimed at the officers a weapon that a reasonable officer at a distance of thirty-five yards would construe as an authentic rifle, not only creating an immediate threat to their safety (and that of the minor children in the area), but also escalating the severity of the crimes for which he could be charged. Although the record does not demonstrate that the officers ordered Estrada to drop his weapon, this factor may be overlooked since Estrada aimed this weapon directly at the officers upon their first sighting of it, all while ordering them away from his trailer. The parties do not dispute that the distance between the

14

officers and Estrada at the time he emerged with his pellet gun was only about thirty-five yards. Nor do the parties dispute that a mere few moments passed between Estrada's emergence with the rifle and his act of pointing the weapon at officers. *Cf. Thomson*, 584 F.3d at 1318.

The totality of the circumstances here "support the heightened immediacy of the threat [the officers] faced and the objective reasonableness of the[ir] use of deadly force." *Larsen*, 511 F.3d at 1260. Facing the need to make a "split-second judgment[]," *see id.* (quotation omitted), the officers were in no position to pause to consider whether the firearm that Estrada was pointing at them was a pellet gun or an AR-15; they were not even in a position to ponder whether the weapon was the same one that Estrada had been seen with earlier. *See id.* ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'" (quotation omitted)). Under these circumstances, it was reasonable for the officers to believe that Estrada was an immediate threat to them, the female children in and around his home, and their neighbors.

Despite some factual distinctions, existing case precedent supports this conclusion. An officer is undoubtedly entitled to qualified immunity for the use of deadly force against a person who appears to be preparing to shoot a lethal weapon at officers. *See Thomson*, 584 F.3d at 1318; *Phillips v. James*, 422 F.3d 1075, 1084 (10th Cir. 2004). In *Tellez v. City of Belen*, an unpublished decision, the Tenth Circuit affirmed the lower court's grant of qualified immunity to officers where the evidence clearly showed that the decedent, a known methamphetamine user who had allegedly threatened someone with a weapon, did not comply with officers' instructions, and raised what turned out to be a pellet gun toward the officers "in a threatening manner." *See* 560 F. App'x 812 (10th Cir. 2014) (unpublished). Similar decisions in other jurisdictions are not uncommon. *E.g.*, *DeMerrell v. City of Cheboygan*, 206 F. App'x 418 (6th

Cir. 2006) (unpublished); *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010); *Bell v. City of East Cleveland*, 125 F.3d 855, 1997 WL 640116 (6th Cir. 1997) (unpublished table decision) (per curiam); *Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996). In these cases, none of the parties argued that the qualified-immunity analysis was altered by the fact that the weapon turned out to be a toy gun. *See, e.g.*, *Tellez*, 560 F. App'x at 815 n.1. Nonetheless, the question here remains the same—whether, "from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Larsen*, 511 F.3d at 1260 (citation omitted). Given the facts recited above, the Court concludes that such force was justified.

Plaintiff challenges this conclusion on two fronts. Plaintiff spends only one paragraph responding to Defendants' legal arguments regarding her Fourth Amendment claims, resting her opposition on her continued insistence that "the officers did not have any reasonable basis to believe that Mr. Estrada was armed with anything other than a B.B. gun." To be sure, the officers (through MVRDA and their own witness interviews) were told several times that Estrada's weapon was possibly or actually a pellet gun. On the other hand, one witness had reported that Estrada was carrying a rifle, and Garcia interviewed another witness who, according to Garcia's uncontroverted affidavit, was ambiguous as to whether the gun was a lethal firearm or a toy. For that matter, when the officers encountered Estrada themselves, he was initially unarmed; he later reemerged from his trailer with a pellet gun designed to look like a rifle and that, for all the officers might have known, was a different weapon than the one he was carrying earlier. Under these circumstances, the individual Defendants have sufficient basis to believe that Estrada was armed with a lethal firearm.

As noted earlier, though, Plaintiff disputes several of these facts. Most notably, Plaintiff states that the individual Defendants' "best and only information" was that Plaintiff was armed

with a pellet gun, specifically "a pellet gun with a red plastic tip," rather than a lethal weapon. However, the Court must reject Plaintiff's baseless attempt to create an issue of material fact on these points.

First, Defendants have introduced uncontroverted evidence that the officers were initially informed that Estrada was carrying and pointing a rifle at someone, including affidavits from Garcia and Cook, a recording from the call to MVRDA dispatch, and the response report created from MVRDA's dispatch logs. Plaintiff also does not present evidence controverting Garcia's sworn statement that a witness told him that Estrada was armed with "a gun or pellet gun" that looked like Garcia's own AR-15. Although Plaintiff may dispute the veracity of these facts, her contrary allegations must find support in the record to create an issue of material fact at this stage of proceedings. *See Thomson*, 584 F.3d at 1312. Without more from Plaintiff, the Court must accept as true the evidence establishing that the officers were told that Estrada's weapon may have been an actual rifle.

Second, Plaintiff presents no evidence that Estrada's weapon was distinguished as an air rifle by a "red plastic tip." The photographic and video evidence submitted by Defendants clearly shows a black rifle with no red plastic tip. *See, e.g.*, **(Doc. 14 Ex. 7)**, Video at 2:24; **(Doc. 14 Ex. 10 Atts. A-C)**; *see also* **(Doc. 11 Att. A)** (showing Estrada's pellet gun and an AR-15 rifle side by side). These exhibits unquestionably establish that the similarities between Estrada's weapon and an authentic AR-15 are striking and the differences minimal. Based on the evidence in the record, including the photograph attached to this opinion as Attachment A, no reasonable officer would be able to distinguish between Estrada's pellet rifle and an authentic AR-15 at a distance of thirty-five yards.[7] The Court should not give credence to Plaintiff's version of the facts if that

---

[7] Attachment A was originally included with Defendants' Exhibit 10. The Court is confident that the most careful and astute observer would be unable to determine at a glance which of the weapons shown in Attachment A is the

version "is so utterly discredited by the record that no reasonable jury could have believed [it]." *Scott*, 550 U.S. at 380. Because Plaintiff presents no evidence regarding the design of the rifle to contradict Defendants' submissions, the Court rejects Plaintiff's unsworn, unsupported allegations.

Other assertions by Plaintiff must be rejected for the same reasons. Though Plaintiff insists that the video evidence "clearly shows that Mr. Estrada did not go back into his mobile home after he was confronted by the officers," the lapel camera submitted by Defendants actually depicts Estrada entering and exiting his front door several times. Moreover, the defense statement that Plaintiff seeks to dispute with this assertion describes activity that occurred before the start of the video footage. Similarly, Plaintiff disputes that the officers made any decision to move closer to Estrada to be in range of Guerra's bean-bag gun, despite sworn statements and video evidence to that effect and no evidence to the contrary. Plaintiff's unsupported assertions do not create a genuine issue of material fact on these points.

The individual Defendants' actions were objectively reasonable under the Fourth Amendment, and as such Plaintiff has failed to meet her burden under the qualified-immunity analysis to establish the violation of a constitutional right.[8] The individual Defendants are thus entitled to qualified immunity, and therefore summary judgment, as to Count I.

## III.    Federal Claim Against the City

Count III repeats the claims of Counts I and II, but brings them against the City. Plaintiff alleges that the City is "vicariously liable for all of the actions of the individual Defendants," premising this vicarious liability on both the constitutional claim presented in Count I and the

---

authentic AR-15 rifle without assistance or firearms training. In the attachment, Estrada's weapon is marked with the number 1.

[8] The Court therefore does not reach the question of whether that right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

NMTCA claim brought in Count II.[9] Here, the Court addresses the constitutional claim against the City.

"[V]icarious liability is inapplicable to . . . § 1983 suits." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (citing, *e.g.*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). Although municipal liability for constitutional violations may exist under § 1983, it may not be premised on a theory of *respondeat superior*. *Dodds v. Richardson*, 614 F.3d 1185, 1197 (10th Cir. 2010) (quotation omitted). Therefore, to establish municipal liability under § 1983, Plaintiff must show the existence of (1) "municipal action . . . taken with the requisite degree of culpability," (2) a deprivation of constitutional rights, and (3) "a *direct causal link*" between the former and the latter. *See id.* at 1202 (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). Here, since the Court has found that the individual Defendants' actions were objectively reasonable under the Fourth Amendment, there is no constitutional violation to link to a municipal policy. Plaintiff's § 1983 claim against the City must therefore fail.

### IV.     Denial of Medical Assistance

In Count IV, Plaintiff asserts that the individual Defendants violated his Fourth, Eighth, and Fourteenth Amendment rights, as well as provisions of the NMTCA, by unreasonably delaying the provision of medical care to Estrada. The Court focuses on the constitutional claim of delayed medical care.

Claims of delayed medical treatment do not fall under the Fourth Amendment. Strictly speaking, claims regarding the delay of medical care for arrestees and pretrial detainees likewise are not covered under the Eighth Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Instead, the Eighth Amendment's standard of deliberate indifference to a

---

[9] Despite this expansive wording, Count III does not appear to contemplate municipal liability for the claims brought in Count IV. *See* (**Doc. 1**), Complaint, at 3 (incorporating only the factual allegations and the claims preceding Count III).

prisoner's medical needs applies to pretrial detainees, and even arrestees, under the Fourteenth Amendment's Due Process protections. *See Wilson v. Meeks*, 52 F.3d 1547, 1555-56 (10th Cir. 1995) (citing, *e.g.*, *Howard v. Dickerson*, 34 F.3d 978, 980-81 (10th Cir. 1994)); *see also City of Revere*, 463 U.S. at 244 (addressing municipalities' obligations to persons injured while being apprehended by police). The parties do not dispute that Estrada was a detainee for Fourteenth Amendment purposes.

A claim of deliberate indifference requires a showing that the deprivation of medical care was "sufficiently serious" and that the purportedly liable official knew of and disregarded "an excessive risk to inmate health or safety." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)). Further, a delay in medical care may only satisfy this standard "where the plaintiff can show that the delay resulted in substantial harm." *Id.* (citing *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993)). Defendants do not appear to dispute that Estrada's medical needs were serious. Instead, they argue that they did not disregard these needs and that Estrada's death "is in no way attributable" to the individual Defendants' action or inaction.

In *Wilson*, after a police officer shot a man holding a gun, other officers had the shooting victim handcuffed before medical help arrived. *See* 52 F.3d at 1550. From there, the officers did not administer medical care or first aid before emergency medical technicians ("EMTs") arrived, and the victim's estate later alleged that the officers interfered with one EMT's efforts by refusing to remove the handcuffs on the EMT's requests, though the officer did allow the EMT to remove them. *See id.* The Tenth Circuit, applying the Fourteenth Amendment's deliberate-indifference standard, held that neither the handcuffing nor the refusal to remove the handcuffs

amounted to a constitutional violation. *See id.* at 1556. Further, the Court refused to impose a duty on the officers to render first aid on the facts of that case. *See id.*

Plaintiff has failed to show that the individual Defendants unconstitutionally delayed Estrada's medical treatment. The uncontroverted evidence shows that the officers on the scene called in a "shots fired" notification to MVRDA at the time of the shooting. Garcia's lapel camera indicates that Garcia stayed with Estrada for the next few minutes. Within minutes of the officers' call, paramedics with the City Fire Department had arrived at a staging area, where other officers had taken Estrada. *See, e.g.*, *Tagstrom v. Enockson*, 857 F.2d 502, 503-04 (8th Cir. 1988) (citations omitted). There is no evidence that the individual Defendants took any action to prevent or delay Estrada from receiving this treatment.

Plaintiff focuses on the fact that the individual Defendants did not themselves render any medical care—or more precisely, first aid, *see Wilson*, 52 F.3d at 1556—before Estrada was moved. This is true—as the only officers at the front of the trailer after Estrada was shot, Garcia, Cook, and Guerra spent the first few minutes securing the trailer and making sure no other dangers were present. This, however, does not amount to a disregard of Estrada's medical problems. "[T]he first duty of a police officer is to ensure the safety of the officers and the public." *Id.* Having immediately called in the shooting, and knowing that other officers and first responders were on the way, the individual Defendants were under no constitutional obligation to immediately render medical treatment instead of working to secure the scene. *See id.*; *see also Tagstrom*, 857 F.2d at 504 (finding no delay or denial of medical treatment where officers immediately called in an accident and waited with the victim until ambulances arrived).

Plaintiff has failed to establish that the individual Defendants violated Estrada's Fourteenth Amendment Due Process rights, to say nothing of his Fourth and Eighth Amendment

rights, by delaying or denying medical care.[10] Because Defendants are entitled to qualified immunity on this question, the Court grants summary judgment in their favor as to the constitutional claims in Count IV.

## V.   "Claim" for Punitive Damages

Count V purports to allege a claim for punitive damages. Defendants correctly observe, and Plaintiff does not dispute, that a request for punitive damages is not a separate cause of action. *E.g. Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 708 F. Supp. 2d 1209, 1271 (D.N.M. 2010). Thus, to the extent that Plaintiff intends that her request for punitive damages constitute a separate claim, the Court dismisses that claim.

## VI.   Dismissal of State-Law Claims

Having disposed of Plaintiff's § 1983 claims, the Court observes that only state-law claims remain. Count II alleges that the individual Defendants' use of deadly force against Estrada constituted gross negligence under the NMTCA. Count III assigns vicarious liability for this use of force to the City. Count IV alleges that the individual Defendants' alleged delay in providing medical care to Estrada violated the NMTCA.[11]

Once a court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over any remaining state claims. 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). The

---

[10] As before, the Court does not reach the question of whether these rights were clearly established. *See Pearson*, 555 U.S. at 236.
[11] The Court observes that Defendants did not address the state-law portion of Count IV in their motion or briefing.

Court concludes that these factors weigh in favor of dismissing the remaining claims. The Court therefore dismisses these claims without prejudice.

CONCLUSION

For the foregoing reasons,

IT IS THERFORE ORDERED that Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, (**Doc. 14**), is GRANTED with respect to the constitutional claims raised in Counts I, III, and IV, and these claims are DISMISSED WITH PREJUDICE;

IT IS FURTHER ORDERED that Defendants' Motion is DENIED with respect to the remaining state-law claims; and

IT IS FINALLY ORDERED that the Court declines to exercise supplemental jurisdiction over the remaining state-law claims, and that these claims are DISMISSED WITHOUT PREJUDICE.

_____
UNITED STATES DISTRICT JUDGE